Filed 12/3/13; pub. order 12/31/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JORGE L. VASQUEZ,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>FRANKLIN MANAGEMENT REAL ESTATE FUND, INC.,<br><br>Defendant and Respondent. | B245735<br>(Los Angeles County<br>Super. Ct. No. BC449064) |

APPEAL from a judgment of the Superior Court of Los Angeles, Malcolm Mackey, Judge. Reversed and remanded.

Employment Lawyers Group, Karl Gerber and Ann Guleser for Plaintiff and Appellant.

Kimball, Tirey & St. John, Karl P. Schlecht and Michaelene H. Kapson for Defendant and Respondent.

Appellant Jorge L. Vasquez contends the trial court abused its discretion in sustaining respondent Franklin Management Real Estate Fund, Inc.'s demurrers to appellant's claims for constructive discharge in violation of public policy and intentional infliction of emotional distress. The trial court found appellant's allegation that respondent violated the Labor Code by assigning appellant tasks that required extensive use of his vehicle and refusing to reimburse him for mileage did not support either claim. The issue presented is whether the facts alleged supported claims for constructive discharge in violation of public policy or intentional infliction of emotional distress, or could be amended based on factual contentions made by appellant to state such causes of action. We agree with the trial court that appellant did not assert facts sufficient to support the intentional infliction of emotional distress claim. However, we conclude appellant should have been permitted leave to amend his claim of constructive discharge in violation of public policy and therefore reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Original Complaint and Demurrer*

Respondent employed appellant as a maintenance technician from May 2009 until August 2010. In November 2010, appellant brought suit against respondent. The complaint alleged that during appellant's term of employment, respondent paid him a wage of $10 per hour for a 40-hour week. After the first month,

2

appellant's supervisors began instructing him to drive his own truck for work-related errands, such as going to the hardware store to buy items needed for apartments owned or managed by respondent. Appellant estimated that he thereafter drove a minimum of 30 miles per day running errands related to his employment. According to the complaint, appellant told his supervisors nearly every week that he could not afford to pay for the gasoline and vehicle maintenance, and he requested reimbursement. Despite his repeated requests, his supervisors continued to assign him tasks that required many miles of driving and consistently informed him he would not be reimbursed.

In August 2010, appellant informed a new supervisor that he could not afford to maintain his vehicle due to using his money to purchase gasoline for work-related errands. Appellant told the new supervisor he could not "tolerate the work environment of only being paid $10.00 per hour, not being paid for gas and having to drive around town for work without being reimbursed for mileage." When respondent continued to refuse to reimburse for mileage, appellant had "no choice but to resign." Based on these allegations, appellant brought suit for violation of Labor Code section 2802.[1] He also asserted claims for constructive wrongful termination in violation of public policy and intentional infliction of

---

[1] Labor Code section 2802 provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or for his or her obedience to the direction of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful." In *Gattuso v. Harte-Hanks Shoppers, Inc*. (2007) 42 Cal.4th 554, the Supreme Court held that an employer is obliged by this provision to indemnify employees for automobile expenses actually and necessarily incurred in performing employment-related tasks. (*Id*. at pp. 567-568.)

3

emotional distress.[2]  According to the complaint, the public policy respondent allegedly violated was embodied in Labor Code sections 2802 and California's unfair competition law (Bus. & Prof. Code, § 17200, et seq.).[3]

Respondent demurred to the claims for constructive discharge and intentional infliction of emotional distress.  Respondent contended that failure to reimburse for mileage was not sufficiently intolerable or aggravated to support a claim of constructive discharge.  Respondent further contended that appellant failed to allege sufficiently outrageous and extreme conduct to support a claim for intentional infliction of emotional distress.

The trial court sustained the demurrer with leave to amend the claim for constructive discharge and without leave to amend the claim for intentional infliction of emotional distress.  The court found that the complaint failed to allege facts sufficient to constitute a constructive discharge and failed to allege any outrageous conduct on the part of respondent.

B.  *FAC and Demurrer*

Appellant filed a first amended complaint (FAC), adding more detail to the allegations of the original complaint.  The FAC alleged that appellant should have been reimbursed $330 per month based on driving 30 miles each workday and the

---

[2]     A fourth claim for unfair competition in violation of California Business and Professions Code section 17200, et seq. was included in the complaint, but appellant subsequently voluntarily dismissed it, and that claim is not the subject of this appeal.

[3]     Appellant also claimed that respondent's alleged actions violated the public policy embodied in Labor Code section 1103.  Section 1103 provides that an employer who violates "this chapter" is "guilty of a misdemeanor," punishable by a fine or imprisonment.  The provision is contained in Chapter 5 of Part 3 of Division 2 of the Labor Code, which deals with employer attempts to prohibit or prevent employee political activities and whistleblowing.  Appellant does not raise any issues pertaining to section 1103 or any other provision of Chapter 5 in this appeal.

standard mileage rate of 55 cents per mile, and that this represented a significant percentage of his $1,600 monthly salary. Appellant contended that the failure to reimburse him for mileage resulted in his salary of $10 per hour being effectively reduced to less than the minimum wage.[4] However, in asserting his claim for constructive discharge in violation of public policy, appellant did not invoke the minimum wage statutes or claim that the public policy embodied in California's minimum wage laws had been violated.

Respondent again demurred to the constructive discharge claim, contending that the facts alleged did not demonstrate that appellant had been constructively discharged. In his opposition, appellant asserted that the facts alleged showed that the amount he was forced to spend on gasoline and vehicle maintenance left him with insufficient money to sustain himself, thus making his working conditions intolerable. Specifically, he calculated that the amount of unreimbursed expenses left him earning less than the minimum wage.[5]

The court sustained the demurrer without leave to amend. The court found that "failing to pay mileage expenses of $15/day is not conduct that is so intolerable or aggravated that a reasonable person in the employee's position would have felt no choice but to resign." It therefore appeared from the facts alleged that appellant's decision to quit was "not a forced or coerced decision."[6]

_____

[4] The parties agree that the minimum wage at that time was $8.00 per hour.

[5] Appellant's opposition included additional factual allegations not set forth in his complaint or FAC, including that the daily tasks assigned to him required him to drive from Toluca Lake -- where he checked in for the day -- as far as Santa Monica, sometimes more than once a day.

[6] Although respondent had not argued in its moving papers that no fundamental public policy was involved, the court further found that none was implicated by respondent's failure to reimburse appellant for mileage because the failure to reimburse "relate[d] solely to [appellant's] interests and not to the benefit of the public at large."

5

Following settlement of his mileage reimbursement claim, appellant dismissed the remaining causes of action with prejudice and filed this appeal.

## DISCUSSION

### A. *Standard of Review*

When a demurrer is sustained without leave to amend, an appellate court "first review[s] the complaint de novo to determine whether the complaint alleges facts sufficient to state a cause of action under any legal theory or to determine whether the trial court erroneously sustained the demurrer as a matter of law." (*Aguilera v. Heiman* (2009) 174 Cal.App.4th 590, 595.) "Second, we determine whether the trial court abused its discretion by sustaining the demurrer without leave to amend." (*Ibid*.) We will conclude that the trial court abused its discretion by denying leave to amend if there is a reasonable probability that the complaint could have been amended to cure its defects. (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1008.) "[T]he burden is on the plaintiff to show in what manner the complaint can be amended and how such an amendment would cure the defect." (*Gould v. Maryland Sound Industries, Inc*. (1995) 31 Cal.App.4th 1137, 1153 (*Gould*).)

### B. *Constructive Discharge*

There is no dispute that "employees discharged in violation of fundamental public policy may bring an action against their employer sounding in tort." (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1098 (*Gantt*) overruled in part on another point in *Green v. Ralee Engineering Co.* (1998) 19 Cal.14th 66.) "[T]o establish a constructive discharge, an employee must plead and prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that

6

a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner v. Anheuser-Busch, Inc*. (1994) 7 Cal.4th 1238, 1251 (*Turner*), overruled in part on another ground in *Romano v. Rockwell Internat., Inc*. (1996) 14 Cal.4th 479.)  Respondent contended and the trial court found that appellant was not discharged, but quit voluntarily.  For the reasons discussed, we conclude that a cause of action for constructive discharge in violation of public policy could have been stated based on appellant's factual contentions as set forth in his FAC, opposition to the second demurrer, and brief on appeal.

As the Supreme Court explained in *Turner*, an employer may, in an attempt to avoid liability for a wrongful termination, "refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit." (*Turner*, *supra*, 7 Cal.4th at p. 1244.)  If the employer's conduct "effectively forces an employee to resign," this is a constructive discharge, and is "legally regarded as a firing rather than a resignation." (*Id*. at pp. 1244-1245.)

An employee may not simply "'quit and sue,'" claiming to have been constructively discharged. (*Turner*, *supra*, 7 Cal.4th at p. 1246.)  The facts must support a finding that the resignation was "coerced," rather than "simply one rational option for the employee." (*Ibid*.)  "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." (*Ibid*.)  Moreover, "the cases are in agreement that the standard by which a constructive discharge is determined is an objective one -- the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' [Citations.]" (*Id*. at p. 1248, quoting *Rochlis v. Walt Disney Co*. (1993) 19 Cal.App.4th 201, 212.)  In other

7

words, the applicable standard is whether "'the adverse working conditions [are] so intolerable'" or "unusually adverse" that "'any reasonable employee would resign rather than endure [them].'" (*Turner*, *supra*, at p. 1247, quoting *Slack v. Kanawha County Housing* (1992) 188 W.Va. 144 [423 S.E.2d 547, 556].)

Although situations may exist where the employee's decision to resign is unreasonable as a matter of law, "[w]hether conditions were so intolerable as to justify a reasonable employee's decision to resign is normally a question of fact. [Citation.]" (*Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1056; accord, *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1022.)

The complaint and FAC essentially described the intolerable working conditions which compelled appellant to resign as being assigned duties which required him to drive his own vehicle every day for many miles without being reimbursed for his expenses in violation of Labor Code section 2802. On appeal, appellant contends he could amend the complaint to allege violations of Labor Code section 1194, subdivision (a).[7] Specifically, he claims the result of respondent's failure to reimburse him for mileage was to force him to "spend his wages by paying back his employer for business expenses," reducing his hourly pay to below the minimum wage.

The general rule is that the existence of a legal violation within the workplace does not, standing alone, establish that the working conditions are intolerable. (*Turner*, *supra*, 7 Cal.4th at p. 1254.) Nor do deprivations of salary or other economic benefits generally support a constructive discharge claim. (See

---

[7] Labor Code section 1194, subdivision (a) provides: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit."

*Turner*, *supra*, at p. 1247 [poor performance rating, accompanied by demotion and reduction in pay, did not constitute constructive discharge]; *Scotch v. Art Institute of California*, *supra*, 173 Cal.App.4th at p. 1023 [potential change in instructor's employment status to part-time did not constitute constructive discharge]; *King v. AC & R Advertising, et al.* (9th Cir. 1995) 65 F.3d 764, 767-769 (applying California law) [reducing employee's salary and changing annual bonus did not constitute constructive discharge].)  Accordingly, in the typical case, an employer's failure to reimburse an employee for expenses that should have been borne by the employer would not create such intolerable working conditions that the employee would have no option but to resign.

Here, however, appellant alleged not only that respondent violated the Labor Code by failing to reimburse for mileage, but that the duties respondent assigned required such extensive driving that the reimbursement to which he was entitled represented a significant percentage of his already low salary.  Appellant specifically alleged in the FAC that he drove a minimum of 30 miles per day.  In his opposition to the demurrer, he asserted that he regularly drove as far as Santa Monica after checking in with his supervisor in Toluca Lake.  As a result of paying for the gasoline and vehicle maintenance this schedule required, he was effectively being paid less than the minimum wage.[8]  This left appellant in an untenable position.  Forced to divert so much of his salary to gasoline and vehicle maintenance, he was unable to pay basic living expenses.  (See *Hudgins v. Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109, 1119 [section 1194 of the Labor Code reflects the Legislature's recognition that employees in this state are

---

[8]     At a salary of $10 per hour, appellant earned $80 per day.  He claimed to have driven at least 30 miles per day for work-related purposes.  Assuming a standard mileage rate of 55 cents per mile, he would have been owed $16.50 per day.  Subtracting $16.50 from $80 leaves an effective daily wage rate of $63.50 or $7.9375 per hour.

dependent on receiving a certain minimum salary to purchase the necessities of life].) Moreover, he was wearing out the very vehicle he needed to maintain his livelihood, either by retaining his employment with respondent or finding another job. Had he continued, he would soon have found himself with no job and no vehicle. According to his allegations, he repeatedly informed his supervisors of his dire situation, and implored them to reimburse him. But having effectively passed on a portion of its normal operating expenses to a low wage worker, respondent repeatedly refused. Should appellant present evidence establishing these facts at trial, a reasonable trier of fact could find that respondent "knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner*, *supra*, 7 Cal.4th at p. 1251.)[9] Accordingly, the trial court abused its discretion in sustaining the demurrer to this cause of action without leave to amend.

C. *Public Policy*

---

[9] The distinction between a reduction in salary which does not constitute a constructive discharge and one which leaves the employee with an unlivable wage and no choice but to resign has been recognized by several federal courts. (See, e.g., *Lit v. Infinity Broad. Corp. of Pa.* (E.D. Pa. 2005) 423 F.Supp.2d 485, 490-491 [proof of salary reduction from $50,000 per year to $900 per month would allow jury to reasonably find decision to retire "was not voluntary in any meaningful sense"]; *Gower v. IKON Office Solutions, Inc.* (D. Kan. 2001) 177 F.Supp.2d 1224, 1233-1234 [plaintiff's claim "he could not make a living off his projected salary" supported finding of intolerable working conditions]; *Nolle v. Guitar Center* (W.D. Pa., Oct. 12, 2012) 2012 U.S. Dist. LEXIS 147229 at *3 [plaintiff who "'went from earning a livable wage to earning almost nothing'" raised cognizable claim of constructive discharge].) Although not dispositive, we find these authorities helpful in addressing what an employee must prove to establish a constructive discharge. (See *Turner*, *supra*, 7 Cal.4th at p. 1245 [doctrine of constructive discharge was first recognized in federal cases brought under the National Labor Relations Act].)

As explained in *Foley v. Interactive Data Corporation* (1988) 47 Cal.3d 654 (*Foley*), the public policy basis for a claim of discharge in violation of public policy must be "'firmly established,'" "'fundamental,'" and "'substantial.'" (47 Cal.3d at p. 671, fn. 11.) The public policy at issue must also be "tethered to fundamental polices that are delineated in constitutional or statutory provisions." (*Gantt, supra,* 1 Cal.4th at p. 1095.) Although respondent's demurrers did not raise the issue, the trial court found that no fundamental public policy was implicated by respondent's failure to reimburse appellant for mileage because the failure to reimburse "relate[d] solely to [appellant's] interests and not to the benefit of the public at large." (See *Foley*, *supra*, 47 Cal.3d at p. 671 [where policy at issue "serves only the private interest of the employer, the rationale underlying the [tortious wrongful discharge] cause of action is not implicated"]; *Gantt*, *supra*, at p. 1090 ["The policy in question must involve a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer."].) To the extent appellant's claim is based on failure to pay him the minimum wage, we conclude the trial court erred in finding appellant's claim untethered to a fundamental public policy.

"California has long regarded the timely payment of employee wage claims as indispensable to the public welfare." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 82.) "[W]ages are not ordinary debts[.] . . . [B]ecause of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due." (*In re Trombley* (1948) 31 Cal.2d 801, 809; accord, *Pressler v. Donald L. Bren Co*. (1982) 32 Cal.3d 831, 837.) "[T]he failure to timely pay wages injures not only the employee, but the public at large . . . ." (*Pineda v. Bank of America, N.A*. (2010) 50 Cal.4th 1389, 1400.) ""Delay of payment or loss of wages results in deprivation of the necessities of life, suffering

11

inability to meet just obligations to others, and, in many cases may make the wage-earner a charge upon the public."'" (*Smith v. Superior Court*, *supra*, at p. 82, quoting *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 326.)

In *Gould*, the court rejected the defendant's contention that payment of overtime wages was "not a duty affecting a fundamental public interest but a private matter between [the defendant] and its employees." (*Gould*, *supra*, 31 Cal.App.4th at p. 1148.) Prior to being terminated, the plaintiff had informed the defendant's management about an ongoing failure to pay overtime wages to employees working overtime hours, "conduct which was not only inimical to the public health and general welfare but also illegal." (*Id*. at p. 1149.) The court concluded that the plaintiff's assertion that his discharge followed in retaliation for his reporting violations of the overtime wage law implicated a fundamental public policy of this state and therefore stated a claim for wrongful discharge in violation of public policy. (*Id*. at p. 1150.) The court gave multiple reasons for its conclusion: (1) "[t]he duty to pay overtime wages is a duty imposed by the state; it is not a matter left to the private discretion of the employer [citations]"; (2) wage and hours laws concern not only "'the health and welfare of the workers themselves'" but also "'the public health and general welfare[]' [citation]"; (3) the payment of overtime wages ""'spread[s] employment throughout the work force by putting financial pressure on the employer . . ." [citation]'"; (4) overtime wages "foster[] society's interest in a stable job market"; and (5) the Legislature's decision to criminalize employer conduct in defalcation of Labor Code overtime provisions "reflects a determination the conduct affects a broad public interest." (*Gould, supra,* at pp. 1148-1149.)

*Gould* was followed in *Barbosa v. IMPCO Technologies, Inc*. (2009) 179 Cal.App.4th 1116, where the employee was terminated after making a good faith

claim for overtime wages. The court found that "[t]he common law recognizes the right of an at-will employee to bring an action in tort against his employer for termination of employment that violates a fundamental public policy" and that "[t]he duty to pay overtime wages is a well-established fundamental public policy affecting the broad public interest." (*Id*. at pp. 1121-1122.)

An employer's violation of another compensation provision of the Labor Code was found to implicate a fundamental public policy in *Phillips v. Gemini Moving Specialists* (1998) 63 Cal.App.4th 563 (*Phillips*), where the plaintiff was allegedly discharged from his employment for questioning his employer's right to take a deduction from his paycheck for damaging equipment and objecting to the manner in which the deduction was made. (63 Cal.App.4th at pp. 567-568.) Citing *Gould*, the court in *Phillips* agreed that "an employee's wages are highly important" and that "'the prompt payment of wages due an employee is a fundamental public policy of this state.'" (*Id.* at p. 571, quoting *Gould*, *supra*, 31 Cal.App.4th at p. 1147.) Noting the Labor Code provisions making it a misdemeanor for an employer to willfully fail to pay wages due, the court stated: "[W]ages are highly significant not only to the employee who earns them, but also to his or her family, and to society in general which will be burdened with supporting said persons if the employee is denied his or her wages." (*Phillips, supra,* 63 Cal.App.4th at p. 574.) Observing that "there is in this state a fundamental and substantial public policy protecting an employee's wages," including "freedom from setoffs, such as the one plaintiff has alleged in his complaint," the court held that the demurrer to the plaintiff's claim of constructive discharge in violation of public policy should have been overruled. (*Ibid*.; accord, *Sciborski v. Pacific Bell Directory* (2012) 205 Cal.App.4th 1152, 1174 [employer who fails to pay employee his or her wages or takes unlawful wage deductions violates public policy]; see *Earley v. Superior Court* (2000) 79 Cal.App.4th 1420,

13

1429-1430 [recognizing the "clear public policy" embodied in Labor Code section 1194 "that is specifically directed at the enforcement of California's minimum wage and overtime laws for the benefit of workers"].)

The minimum wage provision at issue here is at least as firmly established, fundamental, and substantial as those at issue in *Gould* and *Phillips*. The minimum wage represents the Legislature's and the Industrial Welfare Commission's best estimate of the minimum an employee working a full time job must be paid to sustain such employee as a resident of this state and pay for the necessities of life. Section 1199, subdivision (b) of the Labor Code makes it a misdemeanor punishable by fine or imprisonment to "[p]ay[] or cause[] to be paid to any employee a wage less than the minimum fixed by an order of the commission." Accordingly, we conclude that California's minimum wage law represents a fundamental policy for purposes of a claim for wrongful termination or constructive discharge in violation of public policy.[10]

### D. *Intentional Infliction of Emotional Distress*

Appellant further contends that respondent's failure to reimburse him for mileage as alleged in the complaint was sufficient to support a claim for intentional infliction of emotional distress. We conclude the trial court did not abuse its discretion in sustaining the demurrer to this cause of action without leave to amend.

"'[T]o state a cause of action for intentional infliction of emotional distress a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's

---

[10] Because we conclude that the minimum wage law represents a fundamental public policy, we need not consider appellant's argument that the alleged violation of the unfair competition law (Bus. & Prof. Code, § 17200, et seq.) provided an alternate public policy basis for his tortious wrongful termination claim.

intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.'" (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc*. (2005) 129 Cal.App.4th 1228, 1259, quoting *Trerice v. Blue Cross of America* (1989) 209 Cal.App.3d 878, 883.) "'Conduct, to be "'outrageous'" must be so extreme as to exceed all bounds of that usually tolerated in a civilized society.'" (*Huntingdon Life Sciences, supra,* at p. 1259.) In order to avoid a demurrer, the plaintiff must allege with "great[] specificity" the acts which he or she believes are so extreme as to exceed all bounds of that usually tolerated in a civilized community. (*Schlauch v. Hartford Accident & Indemnity Co*. (1983) 146 Cal.App.3d 926, 936.)

Appellant cites *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, *Leibert v. Transworld Systems, Inc*. (1995) 32 Cal.App.4th 1693 and *Phillips, supra,* 63 Cal.App.4th 563 for the proposition that termination in violation of public policy can serve as the basis for recovery under an intentional infliction of emotional distress theory. The cases cited all predate the Supreme Court's decision in *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, in which the court held that "'severe emotional distress'" arising from "'outrageous'" conduct that occurred "at the worksite, in the normal course of the employer-employee relationship" is the type of injury that falls within the exclusive province of workers' compensation. (*Id*. at p. 902.) "An employer's intentional misconduct in connection with actions that are a normal part of the employment relationship . . . resulting in emotional injury is considered to be encompassed within the compensation bargain, even if the misconduct could be characterized as 'manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance.'" (*Singh v. Southland Stone, U.S.A., Inc*. (2010) 186

15

Cal.App.4th 338, 366-367 [worker's compensation exclusivity rule barred intentional infliction of emotional distress claim where employer "berated and humiliated [plaintiff], criticized his job performance, and insulted him with profanities on a regular basis"]; see *Ferretti v. Pfizer, Inc*. (N.D. Cal., Aug. 22, 2012) 2012 U.S. Dist. LEXIS 119115 at *32-34 [finding employee's reliance on *Cabesuela* to support intentional infliction of emotional distress claim based on wrongful termination "misplaced" in view of *Miklosy*].)  Accordingly, the trial court did not abuse its discretion in sustaining respondent's demurrer to appellant's claim for intentional infliction of emotional distress.

## DISPOSITION

The judgment is reversed and remanded for further proceedings consistent with this opinion.  Appellant is awarded his costs on appeal.


MANELLA, J.


We concur:


EPSTEIN, P. J.


16

SUZUKAWA, J.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JORGE L. VASQUEZ, | B245735 |
| Plaintiff and Appellant, | (Los Angeles County<br>Super. Ct. No. BC449064 |
| v. | |
| FRANKLIN MANAGEMENT REAL ESTATE FUND, INC., | ORDER CERTIFYING OPINION<br>FOR PUBLICATION |
| Defendant and Respondent. | |

THE COURT*

     Good cause appearing, it is ordered that the opinion in the above entitled matter, filed December 3, 2013, be published in the official reports.

_____

*EPSTEIN, P. J.          MANELLA, J.      .